**UNITED STATES of America,
Plaintiff,**

v.

**Frank LaROCCA, Defendant.**

No. 21505.

United States District Court
W. D. Missouri, W. D.

July 19, 1963.

F. Russell Millin, U. S. Dist. Atty., Clifford M. Spottsville, Asst. U. S. Dist. Atty., Kansas City, Mo., for plaintiff.

Simon & Pierce, Kansas·City, Mo., for defendant.

JOHN W. OLIVER, District Judge.

Many, if not most, of the points raised in defendant's present motion were ruled adversely to defendant at the time of trial or when we overruled defendant's motions for directed judgment of acquittal, which were filed at the close of the Government's case and at the close of the entire case. No useful purpose will be served by a reiteration of our prior ruling of those points.

Additional mention will be made in regard to the following paragraphs of defendant's pending motion which are raised for the first time in defendant's pending motion:

"6. That the Court erred in failing to require the Government to produce at defendant's request, pursuant to Title 18, Section 3500, U.S. C.A., certain statements written in longhand which were testified to and adopted by government witness, William Elmer.

"7. That the Court erred in failing to require the Government to

produce at defendant's request pursuant to Title 18, Section 3500, U.S.C.A., any statements signed or adopted by Government witness, Lena Costanza.

\* \* \* \* \* \*

"21. That the Court erred in failing to give defendant's requested instruction concerning the weight and effect to be given to circumstantial evidence in this case."

Looking first at paragraph 21, we note that defendant relies upon Brown v. United States (8th Cir.1957) 245 F.2d 549, to support the argument that the Government's evidence must exclude every other hypothesis than that of the defendant's guilt. There is some language on page 556 of Brown to the effect that "the burden is on the government to prove the essential elements of the crime by substantial evidence excluding every other hypothesis than that of defendant's guilt". But that statement does not reflect a different rule of substantive law for perjury cases as distinguished from any other criminal case.

The evidence in this case, as in almost every case, was both direct and circumstantial. The evidence was, in my judgment, both substantial and corroborated. Analysis of questions concerning the quantum of evidence necessary to prove guilt beyond a reasonable doubt is blurred if inquiry is limited to attempts to define or to place types of evidence into convenient cubbyholes. And analysis is made more cloudy if we depart very far from instructions that clearly define that proof must be beyond a reasonable doubt.

There are several cases in the Eighth Circuit that have from time to time suggested that there is a "circumstantial evidence" rule of substantive law that requires the Government to negative every hypothesis other than that of the defendant's guilt. I do not think such a rule was ever intended to state a rule of substantive law, but even if it were, I think the rationale of Holland v. United States, 348 U.S. 121, 139–140, 75 S.Ct. 127, 99 L.Ed. 150 (1954) would require

that this Court refuse to follow such a rule. The Supreme Court there approved what Judge Learned Hand had to say in the United States v. Austin-Bagley Corp. case, (2d Cir.1929) 31 F.2d 229, cert. den. 279 U.S. 863, 49 S.Ct. 479, 73 L.Ed. 1002, and in the United States v. Becker case, (2d Cir.1933) 62 F.2d 1007. I also agree with Judge Prettyman's analysis of the problem as stated in Curley v. United States (1947) 81 U.S.App.D.C. 389, 160 F.2d 229, cert. den. 331 U.S. 837, 67 S.Ct. 1511, 91 L.Ed. 1850. See and compare Judge Blackmun's recent decision in Beatrice Foods Co. v. United States (8th Cir.1963) 312 F.2d 29, 40. Because I believe my charge was consistent with Holland v. United States, supra, I rule that defendant's point raised in defendant's paragraph 21 is not tenable.

The points raised in paragraphs 6 and 7 relate to whether or not the Jencks Act was violated. Defendant, in paragraph 6, assumes the existence of certain longhand statements concerning witness Elmer. The portion of the transcript relating to statements given by witness William Elmer and relating to interviews given by witness Lena Costanza is filed concurrently with the filing of this Memorandum and Order so that the record shows the exact testimony of those witnesses.

Page 14 and following of that transcript reflects Elmer's lack of independent recollection of the dates on which he signed the four statements that were received in evidence; that he did not recollect any statements or interviews prior to July of 1960; that the first time anybody called on Elmer a statement was prepared; and that he believed that the statements had been prepared in longhand.

Mr. Millin advised that he knew nothing about any handwritten statement other than the one in evidence. Elmer, on page 16–17, was quite positive that Defendant's Exhibit 1, was the first statement he had given anyone. On page 18, however, Elmer testified his recollection was that all the statements had been taken in longhand; that they had not

been typed as they were being taken; and that the statement was "fetched back" to him, typewritten, for him to read and sign. He did not, however, recollect that he had signed any handwritten statements other than Defendant's Exhibit 4.

As counsel know, trial in this case commenced May 15, 1963. Campbell v. United States, 373 U.S. 487, 83 S.Ct. 1356, 10 L.Ed.2d 501, on its second appeal, was not decided by the Supreme Court until May 27, 1963. That case, for the second time, involved questions under the Jencks Act. In Campbell II, on facts not similar to those here involved, the Supreme Court held that an unsigned statement could, under particular factual circumstances, be a producible written statement within the meaning of Section 3500 (e) (1).

The facts involved in Campbell established that Federal Agent Toomey had taken longhand notes which were complete with respect to the pertinent information; that the notes were in fact recited back to Government witness Staula; that Staula said that Toomey had got it straight; that Toomey's oral presentation to Staula had not merely adhered to the substance of the notes but so far as practical adhered to the precise words used; and that Staula had in fact adopted Toomey's presentation as being correct. Under those established facts, the Supreme Court held that the mere fact that Staula did not actually read and physically sign the longhand notes would not keep the document from being considered an "adopted * * * written statement" producible within the meaning of Section 3500(e) (1) of Title 18, United States Code.

Campbell II emphasized that when a question arose under Section 3500(e) (1) as to whether an unsigned statement should be considered as having been "otherwise adopted or approved" by the witness, such a question necessarily involved questions of fact that must be determined by the trial court. Campbell I, 365 U.S. 85, 81 S.Ct. 421, 5 L.Ed.2d 428 (1961), in fact, sent the case back to the

District to make a determination of the factual questions because adequate inquiry had not been initially made by the trial court in the first instance. Upon return to the Supreme Court, that court was able for the first time, on the second appeal, to say that:

"We now know that the 'paper Staula described' was Toomey's interview notes, and that Staula adopted Toomey's oral presentation based on the notes. Plainly, if Toomey in making the oral presentation was in fact reading the notes back to Staula, the latter's adoption of the oral presentation would constitute adoption of a written statement made by him, namely, the notes."

Campbell II resulted on those facts in still another reversal and remand to the District Court. It is obvious that at least one reason for the extended appellate history of Campbell was due to the District Court's failure to get the record in the trial court in proper order as it related to the questions involved under Section 3500(e) (1). We shall attempt to avoid that difficulty. We also add that various district courts have evidenced apparent difficulty in understanding both what the Supreme Court held in Jencks v. United States, 353 U.S. 657, 77 S.Ct. 1007, 1 L.Ed.2d 1103 (1957) and what the Congress intended when it passed Section 3500 of Title 18, United States Code. We believe that counsel and all appellate courts, if any there may be in this case, are entitled to know how we read the cases and the Act.

Jencks v. United States, supra, rested upon Gordon v. United States, 344 U.S. 414, 73 S.Ct. 369, 97 L.Ed. 447 (1953). Gordon, a unanimous decision, involved the following situation and holding:

"By proper cross-examination, defense counsel laid a foundation for his demand by showing that the documents were in existence, were in possession of the Government, were made by the Government's witness under examination, were contradictory of his present testimony, and that the contradiction was as to rele-

vant, important and material matters which directly bore on the main issue being tried: the participation of the accused in the crime. The demand was for production of these specific documents and did not propose any broad or blind fishing expedition among documents possessed by the Government on the chance that something impeaching might turn up. * * * Despite some contrary holdings on which the courts below may have relied, we think their reasoning is outweighed by that of highly respectable authority in state and lower federal courts in support of the view that an accused is entitled to the production of such documents."

■ Whether Jencks actually represented any real extension of the rule applied in Gordon need not be determined. It is certain, however, that Jencks, relating to documents admittedly in existence, made clear that a defendant was not required to establish as part of the foundation essential for production the additional fact that the documents were inconsistent with the testimony of the witness on direct examination. Referring to Gordon, the Supreme Court held in Jencks that:

"The necessary essentials of a foundation, emphasized in that opinion, and present here, are that '[t]he demand was for production of * * *specific documents and did not propose any broad or blind fishing expedition among documents possessed by the Government on the chance that something impeaching might turn up. Nor was this a demand for statements taken from persons or informants not offered as witnesses.' (Emphasis added). 344 U.S., at 419 [73 S.Ct. at 373]. We reaffirm and reemphasize these essentials. 'For production purposes, it need only appear that the evidence is relevant, competent, and outside of any exclusionary rule. * * *' 344 U.S., at 420 [73 S.Ct. at 373]."

\*     \*     \*     \*     \*     \*

"We hold that the petitioner was not required to lay a preliminary foundation of inconsistency, because a sufficient foundation was established by the testimony of Matusow and Ford that their reports were of the events and activities related in their testimony."

The portion of Jencks that evidently caused the Congressional uproar related to the question of whether the documents were to be screened by the trial judge before the defendant got a look at them or whether the defendant was entitled to his look before the trial court ruled on the question of admissibility. It is clear that under the rule of the Jencks case, and *before* the enactment of Section 3500, the defendant was entitled to a first look. That case held:

"We now hold that the petitioner was entitled to an order directing the Government to produce for inspection all reports of Matusow and Ford in its possession, written and, when orally made, as recorded by the F.B.I., touching the events and activities as to which they testified at the trial. We hold, further, that the petitioner is entitled to inspect the reports to decide whether to use them in his defense."

And, as a matter of policy in judicial administration, the Supreme Court held in Jencks that:

"The practice of producing government documents to the trial judge for his determination of relevancy and materiality, without hearing the accused, is disapproved. Relevancy and materiality for the purposes of production and inspection, with a view to use on cross-examination, are established when the reports are shown to relate to the testimony of the witness. Only after inspection of the reports by the accused, must the trial judge determine admissibility—e.g., evidentiary questions of inconsistency, materiality and relevancy—of the contents and the method to be employed for the elimination of parts immaterial or irrele-

vant.  See Gordon v. United States, 344 U.S., at 418 [73 S.Ct. at 372]."

Congress passed Section 3500 after and in response to the Jencks decision. Paragraph (a) of that Section prohibits production of any statement or report of a government witness or a prospective government witness to an agent of the government until the witness has actually testified at trial on direct examination. Paragraph (b), contrary to the judicial rule of Jencks, requires on motion of the defendant, the production of the statement for initial inspection by the trial court.  That paragraph and paragraph (c) require the trial court to determine what portions of such a statement relate to the subject matter of the testimony of the witness.  The inspection by the trial court is required to be in camera.

Paragraph (c) also provides that if any portion of a statement is withheld and the defendant objects to such withholding, and the trial continues to an adjudication of guilt, the entire text of the statement is to be preserved under seal in the record so that the appellant court may determine the correctness of the ruling of the trial judge.

Paragraph (d) provides that a defendant may move to strike the testimony of the witness if the government does not comply with an order to produce.

Paragraph (e) defines a "statement" to mean "(1) a written statement made by said witness and signed or otherwise adopted or approved by him; or (2) a stenographic, mechanical, electrical, or other recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement made by said witness to an agent of the Government and recorded contemporaneously with the making of such oral statement".

Palermo v. United States, 360 U.S. 343, 79 S.Ct. 1217, 3 L.Ed.2d 1287 (1959), was the first case that construed the Jencks Act.  On the facts, that case held that a summary of a government agent of an interview with a witness was not required to be produced because it was not a "statement" within the meaning of either clause (1) or clause (2) of paragraph (e) of Section 3500.

The following comments from the majority opinion reflect the rationale of that opinion:

"One of the most important motive forces behind the enactment of this legislation was the fear that an expansive reading of Jencks would compel the undiscriminating production of agent's summaries of interviews regardless of their character or completeness.  Not only was it strongly feared that disclosure of memoranda containing the investigative agent's interpretations and impressions might reveal the inner workings of the investigative process and thereby injure the national interest, but it was felt to be grossly unfair to allow the defense to use statements to impeach a witness which could not fairly be said to be the witness' own rather than the product of the investigator's selections, interpretations and interpolations.

\*    \*    \*    \*    \*    \*

"It is clear that Congress was concerned that only those statements which could properly be called the witness' own words should be made available to the defense for purposes of impeachment.

\*    \*    \*    \*    \*    \*

"The Act's major concern is with limiting and regulating defense access to government papers, and it is designed to deny such access to those statements which do not satisfy the requirements of (e), or do not relate to the subject matter of the witness' testimony.  It would indeed defeat this design to hold that the defense may see statements in order to argue whether it should be allowed to see them."

Mr. Justice Brennan, joined by the Chief Justice, Mr. Justice Black, and Mr. Justice Douglas, concurred in the result. The concurring opinion pointed out that:

"The statute is to be given a reasonable construction, and the courts

must not lose sight of the fact that the statute regulates *production* of material for possible use in cross-examination, and does not regulate *admissibility* into evidence—as the Court properly observes. * * * I repeat that Congress made crystal clear its purpose only to check extravagant interpretations of Jencks in the lower courts while reaffirming the basic holding that a defendant on trial should be entitled to statements helpful in the cross-examination of government witnesses who testify against him." (Emphasis the Court's)

■ So far as this case is concerned attention must be focused on Rosenberg v. United States, 360 U.S. 367, 79 S.Ct. 1231, 3 L.Ed.2d 1304 (1959), decided the same day as Palermo. Rosenberg made clear that even if a trial court errs in failing to deliver to a defendant documents within the coverage of Section 3500, still a defendant is not automatically entitled to a new trial. On the facts, the government failed to deliver a handwritten statement which had been signed by the witness although it had delivered a typewritten copy of the same statement to the defendant. The majority held that "no relevant purpose could have been served by giving petitioner's counsel a typewritten copy of a document which he had already been given in its original form. No advantage to the petitioner was denied by withholding it" (l. c. 370 of 360 U.S., l. c. 1233 of 79 S.Ct.).

In regard to other documents held to be within the coverage of Section 3500, the majority held that while it was error not to have required production, nevertheless, such error was harmless inasmuch as "the same information that would have been afforded had the document been given to defendant was already in the possession of the defense by way of the witness' admissions while testifying, [so that] it would deny reason to entertain the belief that defendant could have been prejudiced by not having had an opportunity to inspect the letter

[that should have been produced]." (l. c. 371 of 360 U.S., l. c. 1234 of 79 S.Ct.).

The decision was unanimous on the issue of the handwritten statement—typewritten statement question. On that subject the dissenting opinion held:

" * The defense was not given a typed statement signed by Meierdiercks which was discoverable under the statute, but this was harmless error since the defense was given a handwritten statement from which the typed statement had been copied."

In Killian v. United States, 368 U.S. 231, 82 S.Ct. 302, 7 L.Ed.2d 256 (1961), the applicability of the doctrine of harmless error was recognized and applied. And Campbell II likewise recognizes "the principles [of harmless error] laid down in Rosenberg v. United States, 360 U.S. 367, 79 S.Ct. 1231, 3 L.Ed.2d 1304".

■ In light of the principles above established by the Supreme Court and in light of the vagueness of witness Elmer's recollection as to whether the statements were initially handwritten or whether they were initially typed, we required the government to give us the full factual background concerning the interviews and statements of witness Elmer and witness Lena Costanza, mentioned in paragraph 6 and 7 of defendant's motion.

We attach hereto the affidavits of the government's agents concerning the circumstances under which the interviews and statements were obtained.

Although the testimony of both witness Elmer and witness Lena Costanza negatives any idea that any unsigned statement had been "otherwise adopted or approved" by either of them within the meaning of Clause 1 of paragraph (e) of Section 3500, we nevertheless required the government to produce for our *in camera* inspection all interview reports made by any government agent in connection with this case.

In the course of our inspection of those interview reports we found a notation that suggested that witness Elmer may

have been interviewed prior to the date of the first statement. We therefore required that the government attempt to locate any interview report concerning such a preliminary interview.

Such a report was located. The government has assured me that it had no prior knowledge of such report. My review of the interview report dated July 7, 1960, reveals that Mr. Elmer had been initially contacted in Gunnison, Colorado, on July 6, 1960; and that information developed at that interview was the background as to why the Bureau of Narcotics determined it important to send Special Agents Glover and Bush to see witness Elmer again for the purpose of obtaining a written statement. As shown in the affidavit of Mathew J. Gress, dated July 16, 1963, Elmer was not given an opportunity to ratify or approve any notes, if indeed any notes had in fact been made, of the preliminary interview on July 6, 1960. It is apparent that there is no factual data in Elmer's testimony or in the Gress affidavit upon which a finding under clause (2) of paragraph (e) of Section 3500 could be based.

Had all of the information concerning witness Elmer now before me been available to me at the time of trial, it would have been obvious that all "statements", within the meaning of Section 3500, of both witness Elmer and witness Costanza were in fact produced and delivered to the defendant. Elmer's statements were actually introduced in evidence. Had all facts now known been known at trial, I would have then ruled that there was no factual basis calling for the production of the first interview report of Elmer because there was no basis in the record for any finding that such report could have been "otherwise adopted or approved" by witness Elmer within the meaning of clause (1) of paragraph (e) of Section 3500. Witness Elmer's testimony that he did not see any government agents prior to July of 1960, incidentally, is confirmed by all known facts now before the Court.

In further regard to witness Lena Costanza, I have now reviewed *in camera* the interview report and the notes taken by the interviewer. The interview report reflects that Mrs. Costanza neither wanted to testify nor furnished any signed statement. It is crystal clear from her testimony that the agents did not seek to have her adopt or approve any notes that they took during the interview. The affidavits of Special Agent Bush and Special Agent Glover dated July 1, 1963, reflect that Mrs. Costanza did not adopt any statement.

Again on the facts, there is no basis for any finding that the interview report concerning the interview with Lena Costanza could be said to be a "written statement * * * otherwise adopted or approved by" her within the meaning of clause (1) of paragraph (e) of Section 3500. It should be added that Mrs. Costanza's testimony on the stand was entirely consistent with the information that she gave the government agents at the time of her interview.

In the present posture of this case, the Court will entertain any motion that defendant may care to file requesting that the information revealed by the affidavits attached hereto and all the data we have required the government to produce after trial be sealed for perusal by the appellate court under the provisions of paragraph (c) of Section 3500. Defendant, of course, has not had an opportunity to cross-examine the government agents who signed the affidavits. Should defendant desire a hearing for that or any other purpose, a request for such a hearing should be included in the suggested motion or made by separate motion.

Counsel for the defense shall be given five (5) days within which to indicate their desire in connection with the motions mentioned. If no indication is made within that time, or within any extended time the Court may grant for good cause shown upon application of the defendant within the five (5) day period, then defendant's motion for acquittal or for new trial should be and will be denied.

It is so ordered.